IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JONATHON GLADNEY, #228295, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:18-CV-442-WKW |
| | ) | [WO] |
| | ) | |
| WILLE BURKS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

## I.  INTRODUCTION[1]

This 42 U.S.C. § 1983 action is before the court on a complaint and amendments
thereto filed by Jonathon Gladney, an indigent state inmate, for alleged constitutional
violations which occurred during a prior term of incarceration at the Elmore Correctional
Facility.  Gladney names Lt. Willie Burks, Warden Joseph Headley and Lt. Walter Posey,
correctional officials employed at Elmore during the time of the complaint, Corizon Health
Care, the former contract medical care provider for the Alabama Department of
Corrections, and Janice D. Reeves, a Licensed Practical Nurse employed by Corizon at the
time relevant to the complaint, as defendants.  Other than advising he sues the defendants
for a denial of medical and mental health treatment, Gladney makes no request for relief in
the original complaint but, throughout his initial amendment to the complaint, he seeks

---

[1]All documents and attendant page numbers cited herein are those assigned by the Clerk of this court in the
docketing process.

compensatory damages from the defendants.  Doc. 15.  Upon its liberal construction of the complaint, as amended, the court construes these documents to seek relief from the defendants in their individual and official capacities.

In the instant complaint and amendments thereto, Gladney complains the correctional defendants acted with deliberate indifference to his health by failing to timely refer him for medical and mental health treatment after verbal and physical altercations with inmate Davieon Williams on the morning and afternoon of August 30, 2016, respectively.  Specifically, Gladney maintains that after the afternoon physical altercation, an altercation which resulted in Gladney stabbing Williams to death, his transport to the health care provider did not occur until approximately five and one-half hours after this physical altercation.  Doc. 1 at 3; Doc. 66 at 1–2.  Gladney also challenges the lack of his referral to mental health services after the verbal altercation with inmate Williams on the morning of August 30, 2016 and the subsequent physical altercation with inmate Williams later that afternoon.  Doc. 72 at 9–10.  Finally, Gladney alleges Nurse Reeves acted with deliberate indifference to his medical and mental health needs at the time she assessed his condition on the night of the altercations.  Doc. 1 at 3; Doc. 72 at 12.[2]

---

[2]Although Gladney also references a claim of deliberate indifference to his safety arising from an alleged failure to protect him from attack by inmate Williams, Gladney litigated this claim in *Gladney v. Headley, et al*., Civil Action No. 2:17-CV-21-ECM-JTA (M.D. Ala. 2020), and this court decided such claim adversely to him in that case.  *Id*.  In light of the prior case and so as not to run afoul of the bar against malicious claims, Gladney filed a document herein, Doc. 66, which the court construed as an amendment to the complaint, advising that in the instant case he does not raise a claim of deliberate indifference for the alleged failure to protect him from attack by inmate Williams.  Doc. 66 at 1–2.  As such, this failure to protect claim is not before the court for review in the present case, and this case is therefore pending disposition solely on Gladney's claims of deliberate indifference lodged against the defendants regarding the medical and mental health treatment provided to him on August 30, 2016.

The defendants filed special reports, supplemental special reports and relevant evidentiary materials in support of their reports, including affidavits and certified copies of pertinent medical and mental health records, addressing the claims presented by Gladney. In these documents, the defendants adamantly deny they acted in violation of Gladney's constitutional rights in providing medical or mental health treatment to him on August 30, 2016. Specifically, the defendants maintain they did not act with deliberate indifference to Gladney's medical or mental health needs. The relevant medical and mental health records support this assertion as these records demonstrate Gladney received treatment from medical and mental health personnel when they deemed his physical or mental condition warranted treatment.

After reviewing the initial special reports and supplements to the reports filed by the defendants, the court issued an order on October 30, 2018 directing Gladney to file a response to each of the arguments set forth by the defendants in their reports and advising him that his response should be supported by affidavits or statements made under penalty of perjury and other appropriate evidentiary materials. Doc. 69 at 2. The order specifically cautioned that "**unless within fifteen (15) days from the date of this order a party . . . presents sufficient legal cause why such action should not be undertaken** . . . the court may at any time [after expiration of the time for the plaintiff filing a response to this order] and **without further notice to the parties** (1) treat the special reports and any supporting evidentiary materials as a motion to dismiss or motion for summary judgment, and (2) after considering any response as allowed by this order, rule on the dispositive motion in accordance with the law." Doc. 69 at 3 (emphasis in original). Gladney filed a response

to this order on November 19, 2018, supported by affidavits and other documents.  Doc. 72.  After receipt of additional supplemental special reports from the defendants, the court provided Gladney an additional opportunity to "file a response to such supplemental special reports and [advised him to] do so in compliance with the prior order(s) of this court" but 'need not repeat any arguments previously presented in his response filed on November 19, 2018  (Doc. 72)."  Doc. 74 at 2.  Pursuant to this order, Gladney filed replies to the supplemental special reports.  Doc. 81 & Doc. 82.

Pursuant to the directives of the above described orders, the court now treats the special reports and supplements to these reports filed by the correctional and medical defendants as motions for summary judgment.  Upon consideration of the defendants' motions for summary judgment, the evidentiary materials filed in support thereof, the sworn complaint and responses filed by Gladney, the court concludes that summary judgment is due to be granted in favor of the defendants.

## II.  SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (internal quotation marks omitted); Rule 56(a), Fed.R.Civ.P. ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment "always bears the initial responsibility of informing the district

court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits or properly sworn statements], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (holding that moving party has initial burden of showing there is no genuine dispute of material fact for trial).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present appropriate evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322–24; *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011) (holding that moving party discharges his burden by showing the record lacks evidence to support the nonmoving party's case or the nonmoving party would be unable to prove his case at trial).

When the defendants meet their evidentiary burden, as they have in this case, the burden shifts to the plaintiff to establish, with appropriate evidence, that a genuine dispute material to his case exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact [by citing to materials in the record including affidavits, sworn statements, relevant documents or other materials], the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]"); *Jeffery*, 64 F.3d at 593–94 (holding that, once a moving party meets its burden, "the non-moving party must then go beyond the pleadings, and by its own affidavits [or

statements made under penalty of perjury], or by depositions, answers to interrogatories, and admissions on file," demonstrate that there is a genuine dispute of material fact).  In civil actions filed by inmates, federal courts "must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities [and medical providers].  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." *Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citation omitted).  This court will also consider "specific facts" pled in a plaintiff's sworn complaint when considering his opposition to summary judgment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014); *Barker v. Norman*, 651 F.2d 1107, 1115 (5th Cir. Unit A 1981) (stating that a verified complaint serves the same purpose as an affidavit for purposes of summary judgment).  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).

A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor such that summary judgment is not warranted. *Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007).  The evidence must be admissible at trial, and if the nonmoving party's evidence "is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986); *see also* Fed.R.Civ.P. 56(e).  "A mere 'scintilla'

of evidence supporting the opposing party's position will not suffice[.]"  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).  Only disputes involving material facts are relevant and materiality is determined by the substantive law applicable to the case.  *Anderson*, 477 U.S. at 248.

To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.  At the summary judgment stage, this court should accept as true "statements in [the plaintiff's] verified complaint, [any] sworn response to the [defendants'] motion for summary judgment, and sworn affidavit attached to that response[.]"  *Sears v. Roberts*, 922 F.3d 1199, 1206 (11th Cir. 2019); *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) (holding that a plaintiff's purely self-serving and uncorroborated statements "based on personal knowledge or observation" set forth in a verified complaint or affidavit may create an issue of material fact which precludes summary judgment); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) (citations omitted) ("To be sure, [Plaintiff's] sworn statements are self-serving, but that alone does not permit [the court] to disregard them at the summary judgment stage . . . . Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving.").  However, general, blatantly contradicted and

merely "[c]onclusory, uncorroborated allegations by a plaintiff in [his verified complaint or] an affidavit . . . will not create an issue of fact for trial sufficient to defeat a well-supported summary judgment motion." *Solliday v. Fed. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) (*citing Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990). In addition, conclusory allegations based on purely subjective beliefs of a plaintiff and assertions of which he lacks personal knowledge are likewise insufficient to create a genuine dispute of material fact. *See Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323–24; *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (holding that to establish a genuine dispute of material fact the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). "[T]here must exist a conflict in substantial evidence to pose a jury question." *Hall v. Sunjoy Indus. Group, Inc.*, 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citation omitted). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Although factual inferences must be viewed in a light most favorable to a plaintiff and *pro se* complaints are entitled to liberal interpretation, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *See Beard*, 548 U.S. at 525. Thus, a plaintiff's *pro se* status alone does not compel this court to disregard elementary principles of production and proof in a civil case. Here, after a thorough and exhaustive review of all the evidence which would be admissible at trial, the court finds that Gladney has failed to demonstrate a genuine dispute of material fact in order to preclude entry of summary judgment in favor of the defendants.

### III.  DISCUSSION[3]

### A.  Sovereign Immunity

To the extent Gladney's request for relief is construed to seek monetary damages from the correctional defendants in their official capacities, they are entitled to sovereign immunity. Official capacity lawsuits are "in all respects other than name, . . . treated as a

---

[3]With respect to the immunity defenses, medical defendants Corizon and Reeves, a private medical provider previously contracted to provide medical treatment to Alabama inmates and one of its employees, assert they are likewise entitled to sovereign and qualified immunity. Doc. 62 at 6. However, the court finds that qualified immunity does not extend to these defendants. *Hinson v. Edmond*, 205 F.3d 1264, 1265 (11th Cir. 2000) (holding that a physician employed by a private, for-profit corporation contracted to provide medical care to inmates "is ineligible to advance the defense of qualified immunity."); *Edwards v. Ala. Dep't of Corrs.*, 81 F.Supp.2d 1242, 1254 (M.D. Ala. 2000) (holding that a private entity contracting with a state to provide medical services to its inmates "is not entitled to qualified immunity…."); *see also Richardson v. McKnight*, 521 U.S. 399, 408–12 (1997) (holding that because of the influence of market forces on private employers qualified immunity did not extend to prison guards who were employed by a private, for-profit corporation that had contracted with the state to manage the prison). In addition, for similar reasons that the *Hinson*, *Edwards* and *Richardson* courts declined to extend the doctrine of qualified immunity to a privately employed doctor and prison guards, this court finds that the medical defendants are not entitled to sovereign immunity as such is reserved for the State and its employees.

suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985). As the Eleventh

Circuit has held,

> the Eleventh Amendment prohibits federal courts from entertaining suits by
> private parties against States and their agencies [or employees]. There are
> two exceptions to this prohibition: where the state has waived its immunity
> or where Congress has abrogated that immunity. A State's consent to suit
> must be unequivocally expressed in the text of [a] relevant statute. Waiver
> may not be implied. Likewise, Congress' intent to abrogate the States'
> immunity from suit must be obvious from a clear legislative statement.

*Selensky v. Alabama*, 619 F. App'x 846, 848–49 (11th Cir. 2015) (internal quotation marks

and citations omitted). Thus, a state official may not be sued in his official capacity unless

the State has waived its Eleventh Amendment immunity, *see Pennhurst State School &*

*Hospital v. Halderman*, 465 U.S. 89, 100 (1984), or Congress has abrogated the State's

immunity, *see Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996).

> Neither waiver nor abrogation applies here. The Alabama Constitution states
> that "the State of Alabama shall never be made a defendant in any court of
> law or equity." Ala. Const. Art. I, § 14. The Supreme Court has recognized
> that this prohibits Alabama from waiving its immunity from suit.

*Selensky*, 619 F. App'x at 849. "Alabama has not waived its Eleventh Amendment

immunity in § 1983 cases, nor has Congress abated it." *Holmes v. Hale*, 701 F. App'x 751,

753 (11th Cir. 2017) (citing *Carr v. City of Florence*, Ala., 916 F.2d 1521, 1525 (11th Cir.

1990)).

In light of the foregoing, correctional defendants Burks, Headley and Posey are

entitled to sovereign immunity under the Eleventh Amendment for claims seeking

monetary damages from them in their official capacities. *Selensky*, 619 F. App'x at 849;

*Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998) (holding that state

officials sued in their official capacities are protected under the Eleventh Amendment from suit for damages); *Edwards v. Wallace Community College*, 49 F.3d 1517, 1524 (11th Cir. 1995) (holding that damages are unavailable from state official sued in his official capacity).  Summary judgment is therefore due to be granted in favor of defendants Burks, Headley and Posey on these claims.

## B.  Qualified Immunity

The correctional defendants also raise the defense of qualified immunity to the claims lodged against them in their individual capacities.  Doc. 55 at 4.  "The defense of qualified immunity completely protects government officials performing discretionary functions from suit [for damages] in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  "The purpose of the qualified immunity defense is to protect[] government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Youmans v. Gagnon*, 626 F.3d 557, 562 (11th Cir. 2010) (internal quotations and citations omitted).  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law."  *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citations and quotation marks omitted).  "Unless a government agent's act is so obviously wrong, in light of the pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done

such a thing, the government actor is immune from suit." *Lassiter v. Ala. A&M University Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir. 1994). The Eleventh Circuit has determined that the law is "clearly established" for purposes of qualified immunity "only by decisions of the U. S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." *Jenkins v. Talladega City Bd. of Education*, 115 F.3d 821, 826–27 n.4 (11th Cir. 1997). The Supreme Court "repeatedly ha[s] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009). Qualified immunity, however, is only an affirmative defense to a request for damages, the sole relief sought in this case; it has no impact on requests for declaratory or injunctive relief. *See Wood v. Strickland*, 420 U.S. 308, 315, n.6 (1975) ("Immunity from damages does not ordinarily bar equitable relief as well."), *overruled in part on other grounds by Harlow v. Alexander*, 457 U.S. 800 (1982); *American Fire, Theft & Collision Managers, Inc. v. Gillespie*, 932 F.2d 816, 818 (9th Cir. 1991) (holding that the defense of qualified immunity is limited to actions for monetary damages and does not serve as a defense to actions seeking equitable relief).

"To receive qualified immunity, the government official must first prove that he was acting within his discretionary authority." *Gonzalez*, 325 F.3d at 1234. In this case, it is clear "that the [correctional] defendants were acting within their discretionary authority[]" as correctional officials at the time of the incidents at issue so "the burden shifts to [Gladney] to show that qualified immunity is not appropriate." *Id.*; *see also Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010). To meet this burden, Gladney must prove both that "(1) the defendants violated a constitutional right, and (2) this right was

12

clearly established at the time of the alleged violation." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir.2004); *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004) (same); *Youmans*, 626 F.3d at 562 (citation omitted) ("[O]nce a defendant raises the defense [of qualified immunity and demonstrates he was acting within his discretionary authority], the plaintiff bears the burden of establishing both that the defendant committed a constitutional violation and that the law governing the circumstances was clearly established at the time of the violation."). This court is "free to consider these elements in either sequence and to decide the case on the basis of either element that is not demonstrated." *Id.*; *Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010) (*citing Pearson*, 555 U.S. at 241–42) (holding that a court may analyze the elements "in whatever order is deemed most appropriate for the case.").

### C.  Deliberate Indifference to Medical and Mental Health Needs

Gladney alleges the defendants acted with deliberate indifference to his medical and mental health needs on August 30, 2016.

**1.  <u>Standard of Review.</u>**  To prevail on a claim concerning an alleged denial of medical or mental health treatment, an inmate must—at a minimum—show that the defendant acted with deliberate indifference to a serious medical or mental health need. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989). "A medical [or mental health] need that is serious enough to satisfy the objective component is one that has been diagnosed by a physician as mandating treatment or one that it so obvious that even a lay person would easily recognize the

necessity for a doctor's attention." *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2015) (internal quotation marks and citation omitted).   Neither medical nor prison personnel may subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106; *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995) (holding, as directed by *Estelle*, that a plaintiff must establish "not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat or a delay in [the acknowledged necessary] treatment"); *Engelleiter v. Brevard County Sheriff's Department,* 290 F.Supp.2d 1300, 1308 (M.D.Fla. 2003) (finding that when a delay is alleged deliberate indifference may occur when an official "intentionally delays providing an inmate with access to medical treatment [while] knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by the delay."), citing *McElligott*, 182 at 1255.

The law is clear that neither medical malpractice nor negligence equate to deliberate indifference.

> That medical malpractice—negligence by a physician—is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle v. Gamble,* 429 U.S. 97, 105–07, 97 S. Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir. 1995).  Instead, something more must be shown.  Evidence must support a conclusion that a prison [official's or medical care provider's] harmful acts were intentional or reckless. *See Farmer v. Brennan,* 511 U.S. 825, 833–38, 114 S. Ct. 1970, 1977–79, 128 L.Ed.2d 811 (1994); *Cottrell v. Caldwell,* 85 F.3d 1480, 1491 (11th Cir. 1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams,* 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. DeKalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1191 n. 28 (11th Cir. 1994) (recognizing that

> Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir. 1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to establish "deliberate indifference to [a] serious medical [or mental health] need . . ., Plaintiff[] must show: (1) a serious medical[/mental health] need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009). When seeking relief based on deliberate indifference, an inmate is required to show "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (holding that, for liability to attach, the official must know of and then disregard an excessive risk of harm to the prisoner). Regarding the objective component of a deliberate indifference claim, the plaintiff must first show "an objectively 'serious medical need[]' . . . and second, that the response made by [the defendant] to that need was poor enough to constitute 'an unnecessary and wanton infliction of pain,' and not merely accidental inadequacy, 'negligen[ce] in diagnos[is] or treat[ment],' or even '[m]edical malpractice' actionable under state law." *Taylor*, 221 F.3d at 1258 (internal citations omitted). To proceed on a claim challenging the constitutionality of medical/mental health care "[t]he facts alleged must do more than contend medical malpractice, misdiagnosis, accidents, [or] poor

exercise of medical judgment." *Daniels v. Gladney*, 474 U.S. 327, 330–33 (1986); *Estelle*, 429 U.S. at 106 (holding that neither negligence nor medical malpractice "become[s] a constitutional violation simply because the victim is incarcerated."); *Farmer*, 511 U.S. at 836 (observing that a complaint alleging negligence in diagnosing or treating "a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment[,]" nor does it establish the requisite reckless disregard of a substantial risk of harm so as to demonstrate a constitutional violation.); *Kelley v. Hicks*, 400 F.3d 1281, 1285 (11th Cir. 2005) ("Mere negligence . . . is insufficient to establish deliberate indifference."); *Matthews v. Palte*, 282 F. App'x 770, 771 (11th Cir. 2008) (affirming district court's summary dismissal of inmate complaint because "misdiagnosis and inadequate treatment involve no more than medical negligence."); *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) ("[A] plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment."); *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (holding that misdiagnosis of pituitary tumor sounds in negligence and is not sufficient to show deliberate indifference); *Barr v. Fla. Dept. of Corr.*, 2011 WL 1365552, at *4 (S.D. Fla. April 11, 2011) (finding plaintiff due no relief where misdiagnosis, which led to improper insertion of feeding tube, did not rise to the level of deliberate indifference as misdiagnosis amounted to nothing more than negligence); *Null v. Mangual*, 2012 WL 3764865, at *3–4 (M.D. Fla. Aug. 30, 2012) (finding that misdiagnosis of inmate with Ganglion cyst which "was eventually diagnosed as synovial sarcoma, a form of skin cancer [leading to a later discovery of] multiple spots of cancer on his lungs . . . fail[ed] to show that Defendants acted with deliberate indifference as opposed to mere negligence. . . . At

most, [Defendants] misdiagnosed Plaintiff's growth, which amounts to a claim of negligence or medical malpractice."); *Payne v. Groh*, 1999 WL 33320439, at *5 (W.D. N.C. July 16, 1999) ("An allegation of misdiagnosis, even when accompanied by a speculative allegation of subjective intent, amounts only to the state-law tort of medical malpractice, not to a tort of constitutional magnitude for which Section 1983 is reserved. Conclusory allegations sounding in malpractice or negligence do not state a federal constitutional claim.") (citing *Sosebee v. Murphy*, 797 F.2d 179 (4th Cir. 1986)).

Additionally, "to show the required subjective intent . . ., a plaintiff must demonstrate that the public official acted with an attitude of deliberate indifference . . . which is in turn defined as requiring two separate things: aware[ness] of facts from which the inference could be drawn that a substantial risk of serious harm exists [] and . . . draw[ing] of the inference[.]" *Taylor*, 221 F.3d at 1258 (internal quotation marks and citations omitted) (alterations in original).  Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (holding that defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference).  Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.   When

medical personnel attempt to diagnose and treat an inmate, the mere fact that the chosen

"treatment was ineffectual . . . does not mean that those responsible for it were deliberately

indifferent." *Massey v. Montgomery County Detention Facility*, 646 F. App'x 777, 780

(11th Cir. 2016).

> In articulating the scope of inmates' right to be free from deliberate
> indifference, . . . the Supreme Court has . . . emphasized that not "every claim
> by a prisoner that he has not received adequate medical treatment states a
> violation of the Eighth Amendment." *Estelle,* 429 U.S. at 105, 97 S. Ct. at
> 291; *Mandel* [*v. Doe,* 888 F.2d 783, 787 (11th Cir. 1989)]. Medical treatment
> violates the eighth amendment only when it is "so grossly incompetent,
> inadequate, or excessive as to shock the conscience or to be intolerable to
> fundamental fairness." *Rogers*, 792 F.2d at 1058 (citation omitted). Mere
> incidents of negligence or malpractice do not rise to the level of
> constitutional violations. *See Estelle,* 429 U.S. at 106, 97 S. Ct. at 292
> ("Medical malpractice does not become a constitutional violation merely
> because the victim is a prisoner."); *Mandel*, 888 F.2d at 787–88 (mere
> negligence or medical malpractice 'not sufficient' to constitute deliberate
> indifference); *Waldrop,* 871 F.2d at 1033 (mere medical malpractice does not
> constitute deliberate indifference). Nor does a simple difference in medical
> opinion between the prison's medical staff and the inmate as to the latter's
> diagnosis or course of treatment support a claim of cruel and unusual
> punishment. *See Waldrop,* 871 F.2d at 1033 (citing *Bowring v. Godwin,* 551
> F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991). "[A]s *Estelle* teaches, whether

government actors should have employed additional diagnostic techniques or forms of

treatment is a classic example of a matter for medical judgment and therefore not an

appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d

at 1545 (internal quotation marks and citation omitted). Moreover, the law is clear that

"[a] difference of opinion as to how a condition should be treated does not give rise to a

constitutional violation." *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001); *Hamm

v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (holding that mere fact an inmate

desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (holding that prison medical personnel do not violate the Eighth Amendment simply because their opinions concerning medical treatment conflict with that of the inmate-patient).

The law is likewise clear that an inmate is not entitled to referral to an outside physician for evaluation. *Amarir v. Hill*, 243 F. App'x 353, 354 (9th Cir. 2007) (holding that defendant's "denial of plaintiff's request to see an outside specialist . . . did not amount to deliberate indifference."); *Arzaga v. Lovett*, 2015 WL 4879453, at *4 (E.D. Cal. Aug. 14, 2015) (finding that plaintiff's preference for a second opinion is "not enough to establish defendant's deliberate indifference" as the allegation does "not show that defendant knowingly disregarded a serious risk of harm to plaintiff" nor that defendant "exposed plaintiff to any serious risk of harm."); *Dixon v. Jones*, 2014 WL 6982469, at *9 (M.D. Ala. Dec. 9, 2014) (finding that jail physician's denial of second opinion regarding treatment provided to inmate did not constitute deliberate indifference); *Youmans v. City of New York*, 14 F.Supp. 357, 363–64 (S.D.N.Y. 2014) (noting that "courts in the Second Circuit have held that failure to provide a second opinion is not generally a violation of a prisoner's Eighth Amendment rights."); *Schomo v. City of New York*, 2005 WL 756834, at *10 (S.D.N.Y. Apr. 4, 2005) (finding that doctor's decision to deny inmate a second opinion regarding inmate's physical capabilities did not constitute deliberate indifference "since prisoners are not constitutionally entitled to a second medical opinion.").

   2.  **Medical Defendants.**  Gladney challenges the adequacy of treatment provided

to him by defendant Janice D. Reeves, an employee of defendant Corizon, when

transported to the health care unit on the night of August 30, 2016.  Gladney complains

Reeves did not provide him either medical or mental health treatment at this time.  The

medical defendants adamantly deny acting with deliberate indifference to Gladney's

medical or mental health needs during the time relevant to this complaint.  They maintain

Gladney had continuous access to both medical and mental health personnel and received

treatment from relevant professionals when warranted by his conditions during this time.

   The medical defendants submitted multiple affidavits in response to the complaint

filed by Gladney.  After a comprehensive review of the medical and mental health records

submitted in this case, Doc. 63-5 at 2–59 & Doc. 77-2 at 2–91, the undersigned finds that

the details of treatment provided to Gladney as set forth by defendant Reeves and other

medical personnel in their affidavits are corroborated by the objective medical and mental

health records contemporaneously compiled during the treatment process.  In her initial

affidavit, Reeves addresses the allegations of deliberate indifference lodged against her, in

relevant part, as follows:

   . . . .  I understand that Mr. Gladney generally alleges that he received
   inadequate medical care following an altercation with another inmate on
   August 30, 2016. It is my understanding that Mr. Gladney specifically alleges
   that I delayed in providing him with care following the August 30, 2016,
   altercation, and failed to provide him with adequate care when I assessed
   him following that altercation, including by failing to refer him to a medical
   provider.  Mr. Gladney's allegations are not true, and I deny them entirely.
      I reviewed Mr. Gladney's relevant medical records and refreshed my
   memory of my nursing assessment of Mr. Gladney on August 30, 2016. At
   approximately 10:00 pm on August 30, 2016, a member of the Elmore
   correctional staff informed me that Mr. Gladney had been involved in an

altercation with another inmate and requested that I assess Mr. Gladney and complete a body chart for him. On August 30, 2016, I assessed Mr. Gladney without undue delay after I learned that he had been involved in an altercation. I did not unnecessarily delay in providing care to him. My August 30, 2016, assessment of Mr. Gladney did not detect any signs of an injury or trauma. On August 30, 2016, Mr. Gladney did not express any medical concerns to me, request additional care from me, or voice any complaints to me. Because my August 30, 2016, assessment did not detect any signs of an injury, and Mr. Gladney did not voice any complaints or concerns to me or request additional medical care on that date, I concluded that it was not necessary to refer him to a medical provider on the Staton medical staff for additional medical care. I reached this conclusion in my nursing judgment based [on] the training and instructions I had received as a member of the Staton nursing staff.

I do not recall, and Mr. Gladney's medical records do not document, any occasion when I saw Mr. Gladney following my assessment of him on August 30, 2016. Mr. Gladney never expressed any complaints to me after August 30, 2016, nor did anyone ever inform me that he required additional medical care after that date. If I perceived any indication that Mr. Gladney required different or additional medical care after my August 30, 2016, assessment, I would have taken the necessary steps to ensure that he received appropriate medical care, including an examination by a medical provider on the Staton medical staff if that had been necessary.

Any allegation that I failed to do something related to Mr. Gladney's medical care is false, and I deny it. To be clear, I never deliberately ignored any medical complaints made by Mr. Gladney. I never engaged in any activity or failed to take necessary actions which resulted in or contributed to any harm or injury allegedly incurred by Mr. Gladney. I never refused to follow the directives or recommendations of any physician as it relates to the medical care provided to Mr. Gladney, and I never interfered in the medical care provided to him. Furthermore, I do not know of anyone who refused to follow the directives or recommendations of any physician with respect to Mr. Gladney or interfered in his care.

Doc. 63-2 at 2–4 (paragraph numbering and citations to medical records omitted).

Defendant Reeves provided a supplemental affidavit addressing Gladney's claim regarding mental health treatment.  In this affidavits, Nurse Reeves states:

. . . . Neither I nor any other Corizon employee at Staton was qualified to diagnose or treat any mental health condition. As an LPN on the Staton medical staff, I was not authorized to diagnose mental health conditions or

prescribe medications or any other course of treatment for a mental health condition. Any decisions related to the diagnoses of mental health conditions and the treatment of those conditions were made exclusively by the members of the mental health staff at Staton, ***who were not employed by Corizon***.

Mr. Gladney's medical records refute his allegation that I was indifferent to his mental health needs. Without unnecessarily reiterating my September 24, 2018, declaration, I did see Mr. Gladney on [the night of] August 30, 2016 . . . . On August 30, 2016, at approximately 10:00 pm, I assessed Mr. Gladney without undue delay after I learned that he had been involved in an altercation with another inmate. On August 30, 2016, Mr. Gladney did not express any mental health concerns to me, request a mental health referral or mental health care from me, or voice any complaints related to his mental health. During the course of my August 30, 2016, assessment, I did not observe abnormal behavior on the part of Mr. Gladney or other signs indicating that he required mental health care. If Mr. Gladney had requested mental health care, or if I had observed indications that he required such care, I would have referred him to the mental health staff for assessment and treatment.

If Mr. Gladney believed he required mental health care subsequent to when I saw him on August 30, 2016, he unquestionably knew how to request such care [as indicated by his medical records].

I do not recall, and Mr. Gladney's medical records do not document, any occasion when I saw Mr. Gladney following my assessment of him on August 30, 2016. Mr. Gladney never expressed any complaints to me after August 30, 2016, related to his mental health, nor did anyone ever inform me that he required a mental health referral after that date. If I perceived any indication that Mr. Gladney should be referred to the mental health staff after my August 30, 2016, assessment, I would have taken the necessary steps to ensure that he was referred to the mental health staff.

Any allegation that I was indifferent to Mr. Gladney's mental health needs is false, and I deny it. To be clear, I never deliberately ignored any mental health complaints made by Mr. Gladney. I never engaged in any activity or failed to take necessary actions which resulted in or contributed to any harm or injury allegedly incurred by Mr. Gladney. I am not qualified to provide mental health care to Mr. Gladney, but I certainly never interfered in the mental health care provided to him. Furthermore, I do not know of any Corizon employee at Staton who refused to refer Mr. Gladney to the mental health staff to the extent that such an employee became aware of indications that Mr. Gladney might require such care.

Doc. 80-1 at 2–3 (paragraph numbering and citations to medical records omitted) (emphasis in original).

In addition, Dr. Hugh Hood, the Associate Regional Medical Director for the Alabama Department of Corrections at the time relevant to the complaint, reviewed Gladney's medical records and submitted an affidavit setting forth the treatment provided to Gladney as follows:

Mr. Gladney's medical records outline a clear timeline concerning the medical care provided to him following the August 30, 2016, altercation and demonstrate that he received appropriate care, including a nursing assessment and treatment by Nurse Reeves.

As recorded in Mr. Gladney's medical records, a member of the Elmore correctional staff requested that Nurse Reeves assess Mr. Gladney and complete a body chart at approximately 10:00 p.m. on August 30, 2016, following Mr. Gladney's altercation with another inmate. At that time, Nurse Reeves assessed Mr. Gladney and did not find any indications of an injury. Nurse Reeves' notations in Mr. Gladney's medical records related to the August 30, 2016, assessment indicate that Mr. Gladney did not voice any complaints to Nurse Reeves or request any additional medical care at that time. Nurse Reeves evidently did not refer Mr. Gladney for an appointment with a medical provider on the Staton medical staff following the August 30, 2016, assessment, nor is there any indication that she should have done so. There is no indication in Mr. Gladney's medical records that he required additional medical care or a referral to a medical provider following the August 30, 2016, altercation.

Stated differently, from the medical records reviewed by me, it is apparent that Nurse Reeves acted appropriately in her assessment and treatment of Mr. Gladney on August 30, 2016, and complied with the training and instructions provided to members of the Staton nursing staff for assessing inmates following an altercation and completing a body chart. The nursing care provided by Nurse Reeves on August 30, 2016, was adequate for Mr. Gladney's needs. Mr. Gladney's medical records do not provide any basis for concluding that Nurse Reeves delayed in caring for Mr. Gladney, ignored any complaints or requests for medical care, or intentionally caused him any discomfort whatsoever.

The very next day, i.e. August 31, 2016, the ADOC transferred Mr. Gladney to Draper. There is no question that during his incarceration at Elmore and Draper Mr. Gladney was familiar with and had access to the procedure for requesting medical care through the sick call process [as evidenced by his medical records]. However, Mr. Gladney's medical records reviewed by me reveal that **he did not file any sick call requests voicing**

**medical concerns or requesting medical care between August 31, 2016
and September 10, 2016**.

On September 12, 2016, the Staton  medical staff received a sick call
request submitted by Mr. Gladney in which he voiced concerns of bruised
ribs, difficulty breathing, and discomfort in his jaw. A member of the Staton
nursing staff, although not Nurse Reeves, saw Mr. Gladney at the September
14, 2016, sick call in response to his concerns. The nurse assessed Mr.
Gladney at that time, and Mr. Gladney expressed concerns of discomfort  in
his rib area. The nurse's September 14, 2016, assessment detected tenderness
in Mr. Gladney's neck and chest areas but otherwise found his symptoms
were normal. The nurse provided Mr. Gladney with over-the-counter
Ibuprofen for any discomfort and instructed him to contact the medical staff
if he required any additional care. Notably, the nurse who assessed Mr.
Gladney on September 14, 2016, concluded that he did not require a referral
to a medical provider at that time.

Later that same day, i.e. September 14, 2016, the ADOC transferred
Mr. Gladney to Kilby Correctional Facility ("Kilby") for placement in
restrictive housing. Upon Mr. Gladney's arrival at Kilby on September 14,
2016, a member of the Kilby nursing staff assessed Mr. Gladney and
completed a body chart. Significantly, similarly to the assessments by the
Staton nursing staff, the September 14, 2016, assessment by the member of
the Kilby nursing staff did not detect any signs of trauma or injury to Mr.
Gladney, and during the assessment at Kilby Mr. Gladney did not voice any
concerns, complaints, or requests for additional medical care.

On September 16, 2016, Mr. Gladney submitted a sick call request
voicing concerns of jaw discomfort. That same day, i.e. September 16, 2016,
a member of the Kilby nursing staff assessed Mr. Gladney related to his
concerns of jaw discomfort. The nurse who assessed Mr. Gladney on that
date evidently wrote the incorrect date on the first page of the nursing
encounter tool before correcting the date on the second page. The nurse's
September 16, 2016, assessment did not detect abnormal vital signs or any
other indications that Mr. Gladney required urgent or emergent medical
attention. On September 16, 2016, the nurse referred Mr. Gladney for an
examination by a medical provider due to his concerns of jaw discomfort.

A nurse practitioner on the Kilby medical staff also saw Mr. Gladney
on September 16, 2016. The nurse practitioner examined Mr. Gladney on
September 16, 2016, related to Mr. Gladney's concerns of jaw discomfort.
The nurse practitioner's examination detected some tenderness in Mr.
Gladney's temporomandibular joint (TMJ), which connects the jaw bone to
the cheek bone, but did not find any other signs of an injury or trauma.
Following the September 16, 2016, examination, the nurse practitioner
recommended that Mr. Gladney monitor the tenderness in his TMJ and
request an evaluation by members of the Kilby dental staff if he had

additional concerns. On September 16, 2016, the nurse practitioner also prescribed Mr. Gladney with 325 mg of Tylenol to take twice a day on an as-needed basis for 14 days for any discomfort.

On September 18, 2016, Mr. Gladney submitted a sick call request for an evaluation by a member of the Kilby dental staff regarding the tenderness in his TMJ. Following an initial screening by a member of the nursing staff on September 19, 2016, Mr. Gladney saw the dentist at Kilby on September 20, 2016. The dentist examined Mr. Gladney at that time and determined that Mr. Gladney's jawbone and teeth were not broken. Similarly to the nurse practitioner, the dentist also concluded that Mr. Gladney's symptoms did not relate to anything more serious than tenderness . . . in his jaw. Following the September 20, 2016, examination, the dentist developed a treatment plan for Mr. Gladney to monitor the tenderness and inform the dental staff if the tenderness did not subside. The dentist documented in his notations related to the September 20, 2016, examination that it might be necessary to provide Mr. Gladney with an injection of solumedrol, a corticosteroid medication for treating inflammation, if the tenderness did not resolve.

Mr. Gladney's medical records indicate that the tenderness in his TMJ resolved without any complication because he did not file another sick call request following the September 20, 2016, examination by the dentist until February 21, 2017. Mr. Gladney's February 21, 2017, sick call request expressed concerns related to symptoms suggesting a common cold and did not voice any concerns related to tenderness or discomfort in his jaw, much less mention anything related to the August 30, 2016, altercation. In sum, it appears from my review of Mr. Gladney's medical records that he did not require or request any additional medical care after September 20, 2016, related to the August 30, 2016, altercation. Mr. Gladney underwent multiple examinations by medical providers following September 20, 2016, and these examinations never detected any indications that he suffered any complications whatsoever related to the August 30, 2016, altercation.

Any claim that Nurse Reeves or any other member of the Staton medical staff failed to provide Mr. Gladney with necessary care is false. Mr. Gladney's medical records refute any allegation that his requests for medical care were deliberately ignored or that there was interference in the medical care provided to him. The records do not indicate that any member of the Staton medical staff took any action or failed to take any necessary action that injured Mr. Gladney in any way whatsoever.

There is no reason to conclude that the course of treatment Mr. Gladney received was inappropriate in any way or that the conduct of the Staton medical staff, including Nurse Reeves and other members of the Staton nursing staff, fell below the standard of care of that provided by other similarly situated medical professionals. There is no reason to conclude that Mr. Gladney should have received any additional or different medical

treatment following the August 30, 2016, altercation.  I deny as untrue any
allegation that on any occasion Mr. Gladney failed to receive access to the
medical services available to him at Draper, Elmore, and Staton. In my
professional medical opinion, based on the course of treatment provided to
Mr. Gladney, the members of the Staton medical staff acted appropriately in
all respects. Again, based upon my review of Mr. Gladney's medical records,
I can state to a degree of medical certainty that Nurse Reeves and the other
members of the Staton medical staff fully satisfied the standard of care owed
by them within the State of Alabama.

Doc. 63-1 at 2–7 (paragraph numbering and citations to medical records omitted)
(emphasis in original).

Under the circumstances of this case, the court finds that the course of treatment
undertaken by defendant Reeves did not violate Gladney's constitutional rights.
Specifically, there is no evidence upon which the court can conclude that this defendant
acted in a manner that was "so grossly incompetent, inadequate, or excessive as to shock
the conscience or to be intolerable to fundamental fairness." *Harris*, 941 F.2d at 1505
(internal quotation marks and citation omitted).  Rather, the evidence before the court
demonstrates that defendant Reeves evaluated Gladney at the time he reported to the health
care unit on August 30, 2016 but observed "no injuries" to Gladney nor did he complain
of any injuries or mental health issues to her at that time.  Doc. 63-5 at 44.  Moreover,
Nurse Reeves "did not observe abnormal behavior on the part of Mr. Gladney or other
signs indicating that he required mental health care." Doc. 80-1 at 2.  Whether she "should
have [utilized] additional diagnostic techniques or forms of treatment 'is a classic example
of a matter for medical judgment' and therefore not an appropriate basis for grounding
liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (internal citation omitted).
Furthermore, to the extent the claims for relief sound in negligence or medical malpractice,

neither of these constitutes deliberate indifference actionable in a § 1983 case. *Farmer*, 511 U.S. at 836; *Taylor*, 221 F.3d at 1258; *Matthews*, 282 F. App'x at 771.

As a result, the undersigned finds the treatment provided to Gladney by defendant Reeves did not constitute a violation of the Eighth Amendment. Gladney's conclusory assertions of inadequacy in the treatment provided to him do not create a question of fact in the face of contradictory, contemporaneously created medical records. *Whitehead v, Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010) ("Although [Plaintiff] attempts to overcome summary judgment by offering his own sworn statement[s] . . . to support his allegations, the contemporaneous medical records and opinions of the examining medical [professionals] show that this purported evidence is baseless."); *see Scott v. Harris*, 550 U.S. 372, 380 (2007) (where a party's story "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

In sum, Gladney has presented no evidence that defendant Reeves knew the treatment provided to him created a substantial risk to his physical or mental health and with this knowledge consciously disregarded such risk. The record is therefore devoid of evidence showing defendant Reeves acted with deliberate indifference to Gladney's medical or mental health needs.

With respect to Corizon, the law is well-settled that Gladney is not entitled to relief from this entity based solely on the actions of its employees. For § 1983 liability to attach to a private corporation providing medical care to inmates, a plaintiff must allege his constitutional rights were violated as a result of an established policy or custom of that

corporation.  *Buckner v. Toro*, 116 F.3d 450, 453 (11th Cir. 1997).  Moreover, liability under § 1983 may not be based on Corizon's role as the employer or supervisor of the doctors or nurses who are providing medical treatment to the plaintiff.  *See e.g., Massey v. Montgomery County Detention Facility*, 646 F. App'x 777, 780 (11th Cir. 2016).  Gladney does not identify or challenge any policy of Corizon; instead, he only challenges the treatment provided by a nurse employed by Corizon.  In addition, as previously determined, defendant Reeves did not act with deliberate indifference.  Consequently, summary judgment is due to be granted in favor of the medical defendants on the claims lodged against them.

    **3.  <u>Correctional Defendants</u>.**  The correctional defendants deny they had any knowledge Gladney suffered from serious medical or mental health needs on August 30, 2016 which warranted treatment.  The body chart compiled and photographs taken of Gladney on August 30, 2016, the date of the verbal exchange and subsequent physical incident made the basis of the instant complaint, further establish that Gladney did not suffer any visible serious physical injury nor was one voiced by Gladney or observed during his physical examination by Nurse Reeves.  Doc. 55-4 at 2, Doc. 63-5 at 44 & Doc. 87-1 at 1–4.  The medical records further demonstrate that Gladney did not make any request for mental health treatment or exhibit any need for such treatment at the time relevant to his claims.

    The record before the court establishes that upon becoming aware of a verbal altercation between inmates Gladney and Williams on the morning of August 30, 2016 defendant Posey counseled the inmates by "talking with each of them.  After mutual

agreement between inmates Williams and Gladney that there was no problem between them" and "that no further conflict existed" each signed a Living Agreement and "were allowed to return to population as per normal procedure. . . .  [A]t no time was inmate Williams ALLOWED to be in an unauthorized area. Although [Posey] was aware that a conflict occurred earlier between Gladney and Williams, after talking with both inmates, Posey was assured by both of them that no further conflict existed, which was evidenced by the Living Agreement[] executed.  Therefore, at that time, they were returned to general population.  [Posey] never allowed inmate Williams into an unauthorized area."  Doc. 55-3.  In signing the Living Agreement, the inmates acknowledged they did so "of our own free will with no threats or promises from anyone."  *Gladney v. Headley, et al.*, Civil Action No. 2:17-CV-21-ECM-JTA (M.D. Ala. 2020), Doc. 38-2.[4]  Gladney had no discernible injury and did not seek medical or mental health treatment at this time, both of which were available to him by submitting a request to the relevant provider.

After the physical altercation with inmate Williams on the afternoon of August 30, 2016, defendant Burks questioned Gladney regarding his stabbing of Williams and observed no injuries to Gladney nor did Gladney complain of any injury.  Doc 55-4 at 1.  Burks maintains that to his knowledge "Inmate Gladney sustained no injuries.  Due to inmate Gladney not having any visible injuries and not complaining of any injuries, he was evaluated by medical personnel after the investigation was completed and the victim's body was transported from Staton CF's HCU."  Doc. 68-2.  The medical assessment and

---

[4]This court may take judicial notice of its own records. *Nguyen v. United States*, 556 F.3d 1244, 1259 n.7 (11th Cir.2009).

photographs of Gladney support the defendants' assertions that Gladney suffered no serious physical injury which necessitated medical treatment on the date in question. Moreover, Gladney did not complain of any injury when referred for a medical evaluation. Doc. 55-4 at 2 & Doc. 63-5 at 44.  In addition, Burks avers "Gladney did not make any request for medical or mental health [treatment] to me. . . .  Throughout the incidents inmate Gladney did not appear to be remorseful, angry, agitated and did not act or look to be anything more than normal.  Therefore, there was not any sign or requests that implicated the need for medical or mental health intervention other than the procedural medical assessment [performed by Nurse Reeves]."  Doc. 77-1 at 1.

A review of the mental health records show that Gladney made no request for mental health treatment in the immediate aftermath of the altercations with inmate Williams. These records further establish that Gladney's first encounter with mental health personnel took place on September 15, 2016, and occurred not due to a request by Gladney but based on a referral by correctional officials for a standard assessment related to his assignment to segregation.  Doc. 77-2 at 90–91.  After this evaluation, the mental health provider noted "no indication for further assessment."  Doc. 77-2 at 91.  The mental health records also show that on September 28, 2016 "[c]lassification made a referral for [Gladney] as a predator."  Doc. 77-2 at 89.  The psychological associate assigned to examine Gladney determined that "[b]ased on the inmate's behavior and content of the interview, no mental health referral is warranted at this time."  Doc. 77-2 at 89.  Gladney made no mention of any mental health concerns arising from the August 30, 2016 incidents during either of these mental evaluations.  Doc. 77-2 at 91; Doc. 77-2 at 89.  Finally, Gladney did not seek

mental health treatment for the incident involving his killing inmate Williams until November 8, 2016, well after the incidents in August of 2016.  Doc. 77-2 at 86.

Gladney has failed to establish deliberate indifference on the part of defendants Burks, Headley or Posey.  Specifically, Gladney has not demonstrated that these defendants were aware of facts establishing "an objectively serious medical [or mental health] need" nor that these defendants disregarded any known serious risk to Gladney's physical or mental health.  *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk of harm to the inmate); *Quinones*, 145 F.3d at 168 (defendant must have actual knowledge of a serious condition and ignore known risk to serious condition to warrant finding of deliberate indifference); *Farmer*, 511 U.S. at 838 (failure to alleviate significant risk that officer "should have perceived but did not" does not constitute deliberate indifference).  The court finds that the objective facts in this case, which are supported by the medical and mental health records, do not demonstrate Gladney had a "serious" medical or mental health need requiring attention such that either the failure of an initial referral for medical/mental health treatment or the delay in transporting him to the health care unit after his stabbing of inmate Williams was unreasonable or exacerbated any condition.   Since the correctional defendants did not act with deliberate indifference to Gladney's medical or mental health needs, they are entitled to qualified immunity from the request for monetary damages made against them in their individual capacities and summary judgment is likewise due to be granted in favor of the defendants on this request for relief.

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.      The defendants' motions for summary judgment be GRANTED.

2.      Judgment be GRANTED in favor of the defendants.

3.      This case be DISMISSED with prejudice.

4.      Costs be taxed against the plaintiff.

On or before **July 13, 2021**, the parties may file objections to this Recommendation. A party must specifically identify the factual findings and legal conclusions in the Recommendation to which the objection is made; frivolous, conclusive, or general objections will not be considered.

Failure to file written objections to the proposed findings and legal conclusions set forth in the Recommendations of the Magistrate Judge shall bar a party from a *de novo* determination by the District Court of these factual findings and legal conclusions and shall "waive the right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice.  11TH Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993) ("When the magistrate provides such notice and a party still fails to object to the findings of fact and those findings are adopted by the district court the party may not challenge them on appeal in the absence of plain error or manifest injustice."); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 29th day of June, 2021.


               /s/ Charles S. Coody
               UNITED STATES MAGISTRATE JUDGE